**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISSANKA JESSICA ALVES, : | |
| : | |
| Plaintiff, : | **OPINION** |
| : | |
| v. : | Civ. No. 08-3196 (WHW) |
| : | |
| VERIZON, AT&T, AFNI, INC, : | |
| SOUTHWEST CREDIT SYSTEMS, L.P. et : | |
| al., : | |
| Defendants. : | |

**Walls, Senior District Judge**

Defendants, Verizon New Jersey Inc. ("Verizon") and AT&T Corp. ("AT&T"), move for summary judgment asking the Court to dismiss the claims of plaintiff, Lissanka Jessica Alves. The Court heard oral argument on June 1, 2010.

The Court grants defendants' motion in part. The Court dismisses plaintiff's claims for violations of the Fair Credit Billing Act (First Claim), Fair Debt Collection Practices Act (Second Claim), Fair Credit Reporting Act (Third Claim), and New Jersey Consumer Fraud Act (Fifth Claim). The Court dismisses plaintiff's claim for defamation (Ninth Claim) against Verizon, but not against AT&T. The Court dismisses plaintiff's claim for breach of contract (Seventh Claim) against AT&T, but not against Verizon. The Court does not dismiss plaintiff's claims for negligence (Sixth Claim), common law fraud (Eighth Claim), or intentional infliction of emotional distress (Tenth Claim). The Court refers plaintiff's claim for violation of the Wire or Radio Communication Act (Fourth Claim) to the Federal Communications Commission under the doctrine of primary jurisdiction.

NOT FOR PUBLICATION

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff is a New Jersey resident who moved to her current residence in Newark, New Jersey, in 2005.  (Pl. Rule 56.1 St. ("Pl. St.") ¶ 1.)  Defendant Verizon provided local and long distance telephone service to plaintiff.  (Verizon Rule 56.1 St. ("Verizon St.") ¶ 3.)  Defendant AT&T provides long distance telephone service in the Newark, New Jersey area but did not provide telephone service to Plaintiff.  (AT&T Rule 56.1 St. ("AT&T St.") ¶ 3.)

From September 2006 through February 2008, plaintiff was billed by AT&T for long distance phone calls that she did not make.  AT&T states that Verizon's local switch sent telephone calls seemingly originating from plaintiff's telephone number to the AT&T long distance network for termination.  (AT&T St. ¶ 10.)  AT&T represents that Verizon's local switch was supposed to send such calls to the Verizon long distance network, and that these calls were unable to go directly to the AT&T long distance network without first going through the local Verizon switch.  (AT&T St. ¶ 12.)  AT&T received plaintiff's billing information from the Verizon database.

In September 2006, plaintiff received a bill from AT&T in the amount of $6,671.90.  (Pl. St. ¶ 2.) Plaintiff called the phone companies and informed them that she was not an AT&T customer.  (Pl. St. ¶ 3.)  Nonetheless, AT&T sent the debt for $6,671.90 to a debt collection agency, Southwest Credit Systems, L.P. ("Southwest Credit").  (Pl. Rule 56.1 St. ¶ 4.) The debt was later transferred to a different debt collection agency, AFNI Inc. ("AFNI").  (Id.) AT&T then began a second account without plaintiff's knowledge or permission, even though she was not an AT&T customer.  (Pl. St. ¶ 5.)

NOT FOR PUBLICATION

In January 2007, plaintiff investigated on her own and discovered that she was being charged for long distance calls made by 3 Brothers/Triunfo Food Import, Inc. ("Triunfo"), a New Jersey company.  (Pl. St. ¶ 6.)  Triunfo's manager told Plaintiff that the phone number listed on Plaintiff's phone bill, which she had been using since 2005, had been Triunfo's phone number for 20 years.  (Id.)  Triunfo acknowledged that it had made the calls listed on plaintiff's phone bill.  (Id.)  In August 2006, Triunfo was an AT&T customer.  (Verizon St. ¶ 10.)

Plaintiff contacted Verizon and AT&T and told them about the results of her investigation.  (Pl. St. ¶ 7.)  AT&T told her not to dispute the alleged debt with AFNI while it looked into the matter.  (Id.)  She reported the crossed lines to Verizon on January 8, 2007, at 3:47 p.m., and to AT&T on that same day at 5:48 p.m.  (Pl. St. ¶¶ 8, 9.)  AT&T had a telephone call with Verizon about this matter on January 17, 2007.  (Pl. St. ¶ 9.)  AT&T told plaintiff that it had no control over the main switch, which routed the calls.  (Id.)

AT&T now states that it could not investigate the technical problem with plaintiff's phone line because the local telephone switching facility was owned by Verizon. (AT&T St. ¶ 19.)  AT&T states that, on January 24, 2007, it put on hold an outside collection agency's efforts to collect plaintiff's past due collections.  (AT&T St. ¶ 23.)

On March 2, 2007, Verizon sent plaintiff a check in the amount of $10,773.36 to pay her AT&T bills.  (Pl. St. ¶ 10.)  Plaintiff sent the funds to AT&T.  (Id.)  Of this amount, $6,671.90 covered  the bill for plaintiff's first account with AT&T which had been sent for collection to Southwest and AFNI.  (Id.)  The remaining $4,4101.46 covered the amount owed as of January 27, 2007 on the second account that AT&T had established for her.  (Id.)

NOT FOR PUBLICATION

On April 19, 2007, AT&T sent plaintiff a letter informing her that it had received her check for $6,671 and that she had a zero account balance.  (AT&T St. ¶ 24.)  That same day, AT&T e-mailed Dun and Bradstreet, a provider of credit information on businesses and corporations, to say that negative information associated with AT&T should be removed from plaintiff's account.  (AT&T St. ¶ 25.)  AT&T also had a call with plaintiff and her mortgage lender that day, stating that her account had zero balance.  (AT&T St. ¶ 26.)

The AT&T debt was reported on plaintiff's credit report for four months after she had paid the bill.  (Pl. St. ¶ 12.)  AT&T states that AFNI and Southwest Credit were the collection agencies who reported plaintiff's "delinquency" to the credit bureaus.  (AT&T St. ¶ 37.)

AT&T continued billing plaintiff.  (Pl. St. ¶ 13.)  By April 27, 2007, AT&T had charged her an additional $8,546.84 for long-distance calls she had not made.  (Id.)  AT&T transferred this debt to a different debt collection agency, NCO Financial Systems, Inc.  (Id.)  AT&T then closed the second account it had started for plaintiff and opened a third account without her knowledge or permission.  (Pl. St. ¶ 17.)

Meanwhile, plaintiff had been consistently calling Verizon to fix the problem.  She called Verizon on February 1, March 9, April 15, April 24, April 28, and June 13.  (Pl. Cert. In Opp'n to Mot. for Summary Judgment ¶ 12.)  Each time, Verizon promised to fix the problem within a few days at most, but each time Verizon failed to do so.  (Id.)  Plaintiff notified Verizon that the AT&T charges were being reported to the credit reporting agencies and ruining her credit.  (Id.)

-4-

NOT FOR PUBLICATION

From April 2007 to January 2008, plaintiff was not charged for Triunfo's calls, but her phone bills still included the $8,546.84 for phone calls made on and before April 2007, when her lines with Triunfo were still crossed.  (Pl. St. ¶ 16.)  During this time, AFNI continually sent her letters to pay the original debt of $6,671.90 that she had been billed for, even though she already paid this debt.  (Pl. St. ¶ 18.)  AT&T professed an inability to remove another company's report of debt.  (Id.)  After she continued to press, AT&T told AFNI in August 2007 that this debt was paid.  (Pl. St. ¶ 19.)  AFNI acknowledged this debt had been paid on August 28, 2007, which was about four months after it was actually paid.  (Id.)

Around January 2008, Verizon sent Plaintiff a check in the amount of $8,568.11 to cover the debt on her second account with AT&T that had been transferred to NCO.  (Pl. St. ¶ 20.)  She sent NCO a check for this amount on January 31, 2008.  (Id.)  Plaintiff discontinued her Verizon phone service in early February 2008.  (Pl. St. ¶ 22.)

AT&T charged Plaintiff an additional $2,067.24 for phone calls she never made between March 18 and March 22, 2008.  (Pl. St. ¶ 23.)  AT&T eventually transferred this alleged debt to Southwest Credit for collection.  (Id.)  On May 27, 2008, Plaintiff received a letter from Southwest asking her to pay the debt allegedly owed to AT&T.  (Pl. St. ¶ 25.)  On June 4, 2008, she called Southwest to dispute the debt, but Southwest insisted that she had to pay it.  (Id.)  AT&T billed Plaintiff and Triunfo for the same charges.  (Pl. St. ¶ 28.)

As of June 17, 2008, Plaintiff has received "threatening" calls on her cell phone from "Account's Table for AT&T," which is AT&T's department for collecting past due

NOT FOR PUBLICATION

payments.  (Pl. St. ¶ 26.)  She was accused of committing a federal crime and told that AT&T

planned to take her to court.  (Id.)

        Plaintiff filed her complaint on June 26, 2008.  She named Verizon, AT&T, AFNI

and Southwest as Defendants.  She alleged that defendants violated the Fair Credit Billing Act,

15 U.S.C. § 1666 et seq.; the Fair Debt Collections Act, 15 U.S.C. § 1692; the Fair Credit

Reporting Act, 15 U.S.C. § 1681 et seq.; the Wire or Radio Communications Act, 47 U.S.C. §

201, and the New Jersey Consumer Fraud Act.  Plaintiff also alleged that defendants committed

common law fraud, negligence, beach of contract, defamation and infliction of emotional

distress.  She seeks a declaratory judgment that defendants' conduct was unlawful, actual

damages, statutory damages, punitive damages, treble damages, costs, and reasonable attorney

fees.

        Plaintiff has settled her claims against AFNI and Southwest Credit.  AT&T and

Verizon now move for summary judgment asking the Court to dismiss all claims against them.

STANDARD OF REVIEW

        Summary judgment is appropriate where the moving party establishes that "there

is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for

summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a

verdict for the non-movant and it is material if, under the substantive law, it would affect the

outcome of the suit.  See id. at 248.  The moving party must show that if the evidentiary material

-6-

NOT FOR PUBLICATION

of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

## DISCUSSION

I.      **Availability of Damages Generally**

A.      **Preclusive Effect of Tariff**

Verizon's potential liability is limited by the Schedules of Tariff that it filed, pursuant to regulatory mandate, with the New Jersey Board of Public Utility Commissioners. (Verizon Br. at 5.)  The tariff states in part:

The liability of the Company for damages arising out of mistakes, omissions, interruptions, delays, or errors or defects in transmission, occurring in the course of

-7-

NOT FOR PUBLICATION

> furnishing service, channels or other facilities and not caused by the negligence of the customer or of the Company in failing to maintain proper standards of maintenance, operation and practices and to exercise reasonable supervision, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, or error or defect in transmission occurs

(Tariff B.P.U.-N.J. No.2 ("Tariff"), ¶ 2.4.1.)

The Tariff governs plaintiff's relationship with Verizon.  It provides that Verizon is liable for damages "caused by the negligence of the . . . Company in failing to maintain proper standards."  (Tariff ¶ 2.4.1.)  This indicates that the Tariff does not protect Verizon from liability for negligence.  If plaintiff can prove that Verizon acted negligently in failing to follow proper standards and proximately caused her injury, then the Tariff does not immunize Verizon from liability.  A jury should decide whether plaintiff has sufficient proofs in this case.  None of the cases cited by Verizon suggests that the Court should depart from the plain meaning of the Tariff.

**B.    Doctrine of Primary Jurisdiction**

Defendants contend that the doctrine of primary jurisdiction requires the Court to transfer to an administrative agency the question of whether Verizon acted negligently in failing to follow proper standards.  (Verizon Br. at 7.)  The doctrine of primary jurisdiction requires a court to "transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision."  Richman Bros. Records, Inc. v. U.S. Sprint Communications Co., 953 F.2d 1431, 1435 n.3 (3d Cir. 1991).  Four factors that courts should consider are "(1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue

-8-

**NOT FOR PUBLICATION**

is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made." <u>Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.</u>, 287 F. Supp. 2d 532, 548 (D.N.J. 2003). Issues involving "abstract statutory terms such as 'reasonable' or 'public interest'" are particularly well suited for transfer to an administrative agency under the primary jurisdiction doctrine. <u>FTC v. Verity Int'l, Ltd.</u>, 443 F.3d 48, 61 (2d Cir. 2006).

      Most of the issues in this action are well-suited for resolution by this Court. As example, the general question of whether plaintiff suffered recoverable damages is a type of issue that courts regularly decide. Similarly, most of the claims pled by plaintiff involve issues that are conventionally decided by courts, including whether a statute provides a private right of action, and whether the elements of a particular cause of action have been properly stated. Transfer of this entire action to an administrative agency is not warranted.

      However, with respect to plaintiff's claim for violation of the Wire or Radio Communications Act, 47 U.S.C. § 201(b), transfer to the FCC under the doctrine of primary jurisdiction is appropriate. This statute requires telephone service providers to utilize practices that are "just and reasonable." 47 U.S.C. § 201(b). Claims "based on section 201(b) of the Communications Act are within the primary jurisdiction of the FCC." <u>In re Long Distance Telecomm. Litig.</u>, 831 F.2d 627, 631 (6th Cir. 1987).

      As discussed below, the Court will transfer plaintiff's Wire or Radio Communications Act claim to the FCC, but keep the remainder of the claims and issues in this action under its own jurisdiction. The Court will not stay resolution of the non-transferred claims

NOT FOR PUBLICATION

while awaiting resolution of the transferred claim.  See Advamtel, LLC v. AT&T Corp., 105 F.

Supp. 2d 507, 513 (E.D. Va. 2000) (transferring two causes of action in defendant's counterclaim

to the FCC on the basis of primary jurisdiction, and allowing the remaining claims and

counterclaims to proceed to resolution on the merits).

**C.     Ability to Prove Damages**

Plaintiff submits the following evidence to support her damages claims:

•    March 6, 2009 letter from Capital One to Nass Air (plaintiff's company) denying application for a business loan due to "inefficient liquid assets of guarantor, percentage of revolving credit outstanding, and sufficient credit available" (Supp. Cert., Ex. A);

•    December 8, 2006 letter from American Express to plaintiff stating that her application for a TrueEarnings Card from Costco and American Express was denied because her consumer credit bureau score was too low (Supp. Cert., Ex. B);

•    December 17, 2006 letter from GE Consumer Finance to plaintiff stating that her application for a GE Money Bank Jewelry Account was denied because GE's credit scoring system, which used information provided by a credit reporting agency, determined that her score was too low based on lack of recently reported established accounts, too much time since her oldest revolving account opened, too many inquiries in the last 12 months, and her lack of recent installment information (Supp. Cert., Ex. C);

•    Chart from an Internet site, MortageNewsDaily.com, showing U.S. average weekly interest rates from March 2007 to March 2010.  Plaintiff says that the chart shows that interest rates for consumers with good credit were 5 percent in September 2007.  She states that she received an interest rate of 7.8 percent when she purchased a house at that time, which she attributes to the AT&T debt hurting her credit score (Supp. Cert., Ex. D);

•    Medical related evidence:  prescription form showing that she received a prescription for an Echocardiogram on October 5, 2006;  and receipts for medical work on October 11, 2006 ($654.00), an occult blood stool on October 19, 2006 ($48.00), stay at St. James Hospital on December 5, 2006 ($100.00), and physician visit ($50.00).  (Supp. Cert., Exs. E-K.)  Plaintiff states that these

NOT FOR PUBLICATION

> medical costs were all due to the "deplorable state of events" caused by the telephone billing situation.  Plaintiff notes that the disposition summary she received from St. James Hospital shows that she was recommended to take 2-3 days off from work and received treatment for anxiety;
>
> •   July 17, 2009 letter from Artco Contracting and Development, Inc. stating that "because you will not put up the money to start the job, the bank will not allow us to sign the contract and therefore your proposal has been disqualified" (Supp. Cert., Ex. L);
>
> •   July 16, 2009 letter from Gomes Development to Nass Air stating that its bid was "not accepted due to the fact that you [are] require[d] to have a down payment before you start the work.  (Supp. Cert., Ex. M); and (8) a blank form contract used by Nass Air."

(Supp. Cert., Ex. N.)

The Court finds that some of these damages are not recoverable.  To submit damages to a jury for denial of credit, a party must have evidence from which a reasonable trier of fact could conclude that an inaccurate entry on a credit report "was a 'substantial factor' that brought about" denial of credit to that party."  Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir. 1996) (quoting Keeton et al., PROSSER AND KEETON ON TORTS § 41, at 266-68 (5th ed. 1984)).  Plaintiff cannot demonstrate that the AT&T delinquency on her credit report was a "substantial factor" that brought about any of the denials of credit of which she complains.  The March 6, 2009 denial of credit letter from Credit One Bank to Nass Air (Supp. Cert., Ex. A) was issued after plaintiff's AT&T delinquency was removed from her credit report.  Additionally, at oral argument, plaintiff's counsel did not deny the assertion by AT&T's counsel that the December 2006 denial of credit letters from American Express and GE Consumer Finance (Supp. Cert., Exs. B and C) were mailed to plaintiff before the AT&T delinquency appeared on her credit report.  It follows that none of the letters that plaintiff has presented

-11-

NOT FOR PUBLICATION

support her denial of credit damages claim.

Moreover, plaintiff has not presented any evidence demonstrating that she received a higher interest rate due to a particular credit report.  At oral argument, plaintiff's counsel could not name any witnesses who would be able to testify that this occurred.  Without personal knowledge or expert testimony, plaintiff's own affidavit that she received a higher interest rate due to a particular credit report is not sufficient to allow the recovery of damages resulting from the receipt of a higher interest rate.  See McKinley v. CSC Credit Services, No.05-cv-2340, 2007 U.S. Dist. LEXIS 34528, at *11 (D. Minn. May 10, 2007) (granting summary judgment to defendant on this basis even though plaintiff was a "mortgage loan officer and as a result ha[d] a better understanding of the mortgage industry than others"); Nelson v. Equifax Info Servs., 522 F. Supp. 2d 1222, 1234 (C.D. Cal. 2007) (noting that expert testimony, combined with a plaintiff's own deposition testimony, may support a claim for damages due to a lowered credit score leading to higher interest rates on a home loan).

The Court also will not allow plaintiff to recover damages on the basis of the July 2009 letters that she has presented.  (Supp. Cert., Exs. L-N.)  These letters appear to show that plaintiff's company was disqualified from certain contract bids for failure to make down payments in July 2009, after the AT&T delinquencies had been removed from her credit report.  No reasonable jury could find that the AT&T delinquencies caused those disqualifications.

Conversely, plaintiff can recover damages for emotional distress and for her medical-related expenses.  To recover damages for emotional distress, a plaintiff need not state her emotional damages of humiliation and embarrassment with a great degree of particularity.

-12-

NOT FOR PUBLICATION

See Philbin v. Trans. Union Corp., 101 F.3d 957 (3d Cir. 1996).  A plaintiff in a similar circumstance has been allowed to proceed to trial for emotional distress due to the "considerable time dealing with the entire situation," even when the plaintiff did not pay any of the unauthorized charges on his credit accounts.  Lukens v. Dunphy Nissan, Inc., No. 03-cv-767, 2004 U.S. Dist. LEXIS 14528, at *15 (E.D. Pa. July 23, 2004).  Here, plaintiff's medical bills show that she received treatment for an anxiety-related medical condition in December 2006.  She has presented evidence upon which a jury could find that she spent "considerable time dealing with the entire situation."  Lukens, 2004 U.S. Dist. LEXIS 14528, at *15.  The Court will permit her to present to a jury evidence of her damages for medical-related expenses and emotional distress resulting from defendants' alleged misconduct in this action.

"To recover punitive damages in New Jersey, a plaintiff must prove 'by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.'" Newlin v. Invensys Climate Controls, No. 05-cv-5746, 2006 U.S. Dist. LEXIS 61133, at *6 n.4 (D.N.J. Aug. 16, 2006) (quoting N.J.S.A. 2A:15-5.12(a)).  Plaintiff has presented evidence from which a jury could find that, even though the phone companies were aware of the mis-billing in January 2007, unauthorized charges continued appearing on her account up to summer 2008.  A jury may find that the phone companies acted with a "wanton and willful disregard" of plaintiff who "foreseeably" might have been harmed by their actions.  The Court will  not dismiss plaintiff's claims for punitive damages at this time.

-13-

**NOT FOR PUBLICATION**

**II.    Specific Claims**

      1.      <u>Fair Credit Billing Act ("FCBA")</u> (First Claim)

      The FCBA "requires creditors to investigate and correct billing errors." <u>Dimedio v. HSBC Bank</u>, No. 08-5521, 2009 U.S. Dist. LEXIS 68129, at *5 (D.N.J. Aug. 4, 2009).  In order to bring a claim against a creditor under the FCBA, a consumer is required, within sixty days of receiving a statement with an alleged billing error, to provide the creditor with a written notice.  The notice must include the creditor's  name, relevant account number, belief that the statement contains a billing error, reasons for the belief, and amount of the error.  15 U.S.C. § 1666(a)(1),(2) and (3); <u>Conn-Burnstein v. Saks Fifth Ave. & Co.</u>, 85 Fed. Appx. 430, 431 (6th Cir. 2003).

      Plaintiff claims that defendants violated the FCBA by their "failure to make appropriate corrections in the account of the Plaintiff, including the removal of accounts erroneously billed, and by failure to notify the Plaintiff, in writing of errors, failure to include any explanation of any change in the amount indicated by Plaintiff, and failure to notify the credit bureaus of error."  (Compl. ¶ 42.)

      The Court dismisses with prejudice plaintiff's FCBA claims. Defendants are not liable under FCBA because plaintiff did not provide them with written notice of its billing error. <u>See</u> <u>Carter v. Fairbanks</u>, No. 09-4302, 2009 U.S. Dist. LEXIS 78676, at *1 (D.N.J. Sept. 1, 2009)

**NOT FOR PUBLICATION**

(requiring written notice to trigger FCBA liability).  Verizon is also not liable under FCBA because it did not extend any bill to plaintiff that is relevant to this case.[1]

      2.      <u>Fair Debt Collection Practices Act ("FDCPA")</u> (Second Claim)

Plaintiff says that defendants violated FDCPA by "threatening to sue Plaintiff in an attempt to coerce her pay her debt" and by "attempting to collect an amount not authorized or permitted by law."  (Compl. ¶¶ 49, 50.)

The Court finds that AT&T and Verizon are statutorily exempt from FDCPA liability because they are not "debt collectors" under the statute.  A "debt collector" is defined as a "person who uses any instrumentality of interstate commerce or the mails in any business the principle purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  The term "debt collector" does not include those "who extend credit and collect their own debts."  <u>Kimber v. Fed. Fin. Corp.</u>, 668 F. Supp. 1480, 1486 (M.D. Ala. 1987).  <u>See also</u> <u>Perry v. Stewart Title Co.</u>, 756 F.2d 1197, 1208 (5th Cir. 1985) ("The legislative history of Section 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors . . . . ").  Neither defendant qualifies as a "debt collector" under the statute.  Plaintiff's Second Claim is dismissed with prejudice.

---

[1]    AT&T also may not be liable under FCBA because it may not be a "creditor" under the statute:  AT&T says that it does not regularly extend customer credit and is not alleged to have offered to allow plaintiff to defer payment of her debt.  <u>See</u> 15 U.S.C. § 1602(e) (defining "credit" as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment"), 1602(f) (defining "creditor" as someone who "regularly extends . . . consumer credit").

NOT FOR PUBLICATION

      3.    <u>Fair Credit Reporting Act ("FCRA")</u> (Third Claim)

      The FCRA is designed to protect customers and prevent the circulation of inaccurate information.  <u>Roseman v. Retail Credit Co., Inc.</u>, 428 F. Supp. 643 (E.D. Pa. 1977). The FCRA "proscribes certain conduct pertaining to the reporting of consumer credit information, and creates liability for willful non-compliance." <u>Monica v. MBNA Am. Bank, N.A.</u>, 2006 U.S. Dist. LEXIS 49457, at *9 (D.N.J. July 19, 2006).  Section 1681s-2(a) provides in part that a "person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."  15 U.S.C. § 1681s-2(a)(1)(A).  There is no private right of action under this subsection.  <u>See</u> 15 U.S.C. § 1681s-2(d); <u>Dimedio v. HSBC Bank</u>, No. 08-5521, 2009 U.S. Dist. LEXIS 52238, at *8 (D.N.J. June 22, 2009).

      Section 1681s-2(b) places duties upon "furnishers of information" after they are notified of a dispute.  "[T]o state a claim under this section, a plaintiff must plead that (1) she sent notices of disputed information to a consumer reporting agency, (2) the consumer reporting agency then notified the defendant furnisher of information of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information." <u>Dimedio v. HSBC Bank</u>, No. 08-5521, 2009 U.S. Dist. LEXIS 52238, at *8 (D.N.J. June 22, 2009)  (citing <u>Martinez v. Granite State Mgmt. and Res.</u>, No. 08-2769, 2008 U.S. Dist. LEXIS 94995, at *3 (D.N.J. Nov. 20, 2008)).

      Plaintiff alleges that AT&T violated the FCRA "by furnishing to credit reporting agencies inaccurate information about the debt, failing to state that the debt was disputed, [and]

NOT FOR PUBLICATION

failing to verify the debt." (Compl. ¶ 58.) Plaintiff alleges that AT&T willfully violated the

FCRA "by failing to conduct an investigation with respect to the disputed information, failing to

report the results of the investigation to the consumer reporting agencies, and failing to modify or

delete the disputed item of information." (Compl. ¶ 59.) Plaintiff claims that AT&T "knew or

should have known or consciously avoided knowing that the information repeatedly reported

about Plaintiff was false and improperly attributed to Plaintiff." (Compl. ¶ 60.)

        The Court finds that defendants are not liable under the FCRA. Defendants

cannot be subject to liability under § 1681s-2(a) because "there is no private right of action based

on a furnisher's failure to comply with § 1681s-2(a); enforcement of these provisions is left to

federal agencies." Krajewski v. Am. Honda Fin. Corp., 557 F. Supp. 2d 596, 608 (E.D. Pa.

2008). See also DiMedio, 2009 U.S. Dist. LEXIS 52238, at *8. The Defendants cannot be liable

under § 1681s-2(b) because the "notice of disputed information must come from a consumer

reporting agency, and not the customer, in order to trigger the requirements of" this section.

DiMedio, 2009 U.S. Dist. LEXIS 52238, at *7. Plaintiff has not alleged that a consumer

reporting agency gave notice to defendants that she was disputing her alleged debt. Plaintiff's

Third Claim is dismissed with prejudice.

        4.    Wire or Radio Communications Act (Fourth Claim)

        Plaintiff asserts that AT&T and Verizon violated the Wire or Radio

Communications Act, 47 U.S.C. § 201 et seq. Plaintiff charges that Defendants violated 47

U.S.C. § 201(b) by "charging unjust and unreasonable rates to Plaintiff" (Compl. ¶ 68); 47

U.S.C. § 228(d)(1)(A) by "failing to ensure that Plaintiff would not be billed for per call services

NOT FOR PUBLICATION

she never used" (Compl.  ¶ 69); and 47 U.S.C. § 258(b) by "unlawfully allowing AT&T to serve

as Plaintiff's phone carrier without her knowledge or permission, and in spite of her request to

stop charging her and fix the error in her phone lines."  (Compl. ¶ 70)

      The Wire or Radio Communications Act provides in part that common carries

must utilize "charges, practices, classifications and regulations" that are "just and reasonable."

47 U.S.C. § 201(b).  Courts have found that "claims based on section 201(b) of the

Communications Act are within the primary jurisdiction of the FCC."  In re Long Distance

Telecommunications Litig., 831 F.2d 627, 631 (6th Cir. 1987).  See also North County

Communs. v. Cal. Catalog & Tech., 594 F.3d 1149, 1160 (9th Cir. 2010) ("Because [Plaintiff]

cannot demonstrate a violation of § 201(b) in the absence of an FCC determination, the district

court properly dismissed [Plaintiff's] claims.") (9th Cir. 2010); Telstar Res. Group, Inc. v. MCI,

Inc., 476 F. Supp. 2d 261, 272 (S.D.N.Y. 2007) ("Courts have commonly found that claims

alleging 'unreasonable' practices in violation of § 201(b) of the FCA are within the primary

jurisdiction of the FCC.").

      Section 228(d) applies to a "common carrier that by tariff or contract assigns a

telephone number with a prefix or area code designated by the Commission . . . to a provider of a

pay-per call service."  47 U.S.C. § 228(d).  A "pay-per-call service" is defined as a service

"which is accessed through use of a 900 telephone number or other prefix or area code

designated by the Commission in accordance with subsection (b)(5) of this section."  47 U.S.C.

§ 228(i).

NOT FOR PUBLICATION

Section 258 forbids a telecommunications carrier from engaging in the "unauthorized switching or slamming of consumer interstate or intrastate long distance service." Valdes v. Qwest Commc'ns Int'l, 147 F. Supp. 2d 116, 120 (D. Conn. 2001). Section 258(a) provides that "[n]o telecommunications carrier shall submit or execute a change in a subscriber's selection of a provider of telephone exchange service or telephone toll service except in accordance with such verification procedures as the Commission shall prescribe." 47 U.S.C. § 258(a).

Plaintiff brings her § 201(b) claim in this Court without citing any determination by the FCC that defendants' practices were unreasonable. Without such a determination, plaintiff cannot pursue her § 201(b) claim in this Court. The Court refers plaintiff's § 201(b) claim to the FCC under the doctrine of primary jurisdiction.

Plaintiff's § 228(d) claim is dismissed because there is no evidence in the record that AT&T or Verizon assigned a telephone number to a provider of a pay-per-call service.

Plaintiff's § 258(a) claim is dismissed because she has no evidence that Verizon or AT&T switched her provider of telecommunications service, notwithstanding that a switching error may have caused calls seemingly originating from her phone number to be routed to the AT&T network.

5.    New Jersey Consumer Fraud Act (Fifth Claim)

The New Jersey Consumer Fraud Act ("Fraud Act") extends relief to a person "who suffers any ascertainable loss of moneys or property, real or personal, as a result of any method, act, or practice declared unlawful under the act." N.J.S.A. 56:8-19. The Fraud Act

-19-

NOT FOR PUBLICATION

states that a telecommunications service provider shall not, "on behalf of a customer, make any change . . . in a provider of a telecommunications service for which there are multiple providers, unless the provider . . . complies with authorization and confirmation procedures established by the board and by federal law and rules."  N.J.S.A. 56:8-87.  The Fraud Act also provides that a telecommunications service provider shall not "fail to make any change in a provider of telecommunications service for which there are multiple providers when such change order has been received in a manner that complies with federal and State rules and regulations."  N.J.S.A. 56:8-88.  Any telecommunications provider "who is determined by the [New Jersey Board of Public Utilities], after notice and opportunity to be heard, to have willfully or intentionally violated any provision of this act . . . shall be liable to a civil penalty not to exceed $7,500 for a first violation and not to exceed $15,000 for each subsequent violation associated with a specific access line within the State.  All moneys recovered from an administrative penalty imposed pursuant to this section shall be paid into the State Treasury to the credit of the General Fund."  N.J.S.A. 56:8-91.

N.J.S.A. 2A:32-1 is a remedies provision relating to debts or obligations fraudulently contracted or incurred.  It states in relevant part:  "Whenever there is fraud in the execution or consideration of a contract . . . the person defrauded may, upon discovery of the fraud, either rescind the contract entirely and recover the money or property obtained by the fraud, or sue on the contract to recover thereon."  N.J.S.A. 2A:32-1.

Plaintiff charges that defendants violated the Fraud Act, N.J.S.A. 56:8-87, "by unlawfully charging Plaintiff for service by a provider she never agreed upon and for calls she

NOT FOR PUBLICATION

never made." (Compl. ¶ 75.) She alleges that AT&T and Verizon also violated the Fraud Act,

N.J.S.A. 56:8-88, by their "failure to correct its technical and billing errors associated with

Plaintiff's phone line, even after her request for them to do so." (Compl. ¶ 76.) Plaintiff claims

that she is entitled to relief pursuant to N.J.S.A. 56:8-19 and that she is entitled to actual,

statutory, and punitive damages pursuant to N.J.S.A. 2A:32-1. (Compl. ¶¶ 74, 78.)

Plaintiff has no evidence that any particular provision of the Fraud Act was

violated. There is no evidence that defendants changed plaintiff's provider of

telecommunications service (N.J.S.A. 56:8-87) or failed to make such a change in accordance

with a change order (N.J.S.A. 56:8-88). Plaintiff's claims under the Fraud Act are dismissed

with prejudice.

      6.    <u>Negligence</u> (Sixth Claim)

To prevail on a claim for negligence under New Jersey law, a plaintiff must prove

"1) a defendant had a duty; 2) the same defendant breached that duty; and 3) the breach was the

proximate cause of plaintiff's injuries." <u>Colon v. Mountain Creek Waterpark</u>, No. 06-cv-4298,

2009 U.S. Dist. LEXIS 91351, at *5 (D.N.J. Sept. 30, 2009) (citing <u>LaBracio Family Parternship</u>

<u>v. 1239 Roosevelt Ave., Inc.</u>, 340 N.J. Super. 155, 161 (App. Div. 2001)).

Plaintiff contends that Verizon owed her a duty of care to maintain her telephone

line and account and that AT&T owed a duty to bill the proper owners of long distance

subscriberships for calls that they made. (Compl. ¶¶ 80, 81.) She claims that both companies

breached their duties and "negligently intertwined two phone accounts into the same phone

number, causing undo charges to Plaintiff." (Compl. ¶ 82.)

NOT FOR PUBLICATION

The Court finds that plaintiff's negligence claims survive summary judgment.  As the Court explained at summary judgment (and AT&T's counsel agreed), there is ample evidence that something went wrong on the Verizon/AT&T end that led to plaintiff repeatedly receiving bills for calls she did not make.  A reasonable jury may determine that either, or both parties, acted negligently and proximately caused harm to plaintiff.

      7.    <u>Breach of Contract</u> (Seventh Claim)

To prevail on a breach of contract claim under New Jersey law, a plaintiff must prove four elements: "(1) a valid contract existed between plaintiff and defendant; (2) [defendant] breached the contract; (3) [plaintiff] performed its obligations under the contract; and (4) [plaintiff] was damaged as a result of [defendant's] breach."  <u>Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.</u>, 275 F. Supp. 2d 543, 566 (D.N.J. 2003) (citing <u>Coyle v. Englander's</u>, 199 N.J. Super. 212, 223 (App. Div. 1985)).

Plaintiff alleges that she had a contract with Verizon and that Verizon breached the contract "by failing to ensure that Plaintiff can enjoy her phone line according to her subscribership, by intertwining her phone number with another customer's line," and "by failing to resolve the technical and billing errors, causing Plaintiff's excellent credit to become ruined." (Compl. ¶¶ 90, 91.)

The Court finds that plaintiff has alleged facts upon which a reasonable jury could find that Verizon breached its contract with plaintiff.  The Court will not dismiss plaintiff's breach of contract claim against Verizon on summary judgment.

NOT FOR PUBLICATION

The Court finds that plaintiff's breach of contract claim against AT&T fails because there is no evidence that she ever entered into a contractual relationship with AT&T.

8.    Common Law Fraud (Eighth Claim)

The heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure are applicable to claims of common law fraud in federal court.  Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges."  Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998).  Rule 9(b) "requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story."  Advanta, 180 F.3d at 534 (citation omitted).  A plaintiff "need not, however, plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  Rolo, 155 F.3d at 658 (citation omitted).  The Third Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants."  Rolo, 155 F.3d at 658.

The "five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

-23-

NOT FOR PUBLICATION

intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and

(5) resulting damages."  Gennari v. Weichert Realtors, 148 N.J. 582, 610 (1997).

      Plaintiff claims that defendants "fraudulently charged plaintiff for long distance

calls that she did not make" and "fraudulent gave Plaintiff a phone number that was in use by

someone else."  (Compl. ¶¶ 94, 95.)  She says that defendants "fraudulently misrepresented to

plaintiff that they would cease charging her for the AT&T long distance bills but continued

billing her" and "made numerous fraudulent misrepresentations and committed numerous

fraudulent acts throughout the course of Plaintiff maintaining her phone contact with Verizon."

(Compl. ¶¶ 96, 97.)  She also states that defendants "knowingly and willingly made

misrepresentations about plaintiff's account to the credit reporting agencies" and that she "relied

on the defendants' false representations that they would correct the problem, to her detriment and

suffered damages."  (Compl. ¶¶ 98, 100.)

      Plaintiff asserts that Verizon "consistently represented that they would correct

routing and switch errors.  Plaintiff maintained her telephone status with Verizon for two years

relying on Verizon's fraudulent representations.  Verizon willfully misrepresented that they had

corrected the 'problem.'  Plaintiff suffered damages in paying Verizon charges, instead of

obtaining telephone service through another provider, based upon Verizon's representations."

(Pl. Opp'n to Verizon Br. at 11.)  Plaintiff states that her cost in continuing service with Verizon

for two years was $53.00 to $65.00 per month.  (Id.)

      Plaintiff contends that AT&T committed fraud because AT&T "consistently

represented that they would cease billing for the calls she never made.  AT&T consistently

-24-

NOT FOR PUBLICATION

represented that they would correct the false credit reporting immediately.  AT&T consistently

represented that they would stop turning Plaintiff over to debt collectors, but never did.  Despite

AT&T's actual knowledge of the switch error and turning Plaintiff over to collection four

different times AT&T fraudulently represented to Plaintiff that they would cease.  Plaintiff

suffered damages in suffering two years of total agony, despite AT&T's representations."  (Pl.

Opp'n to AT&T, at 19.)

        The Court declines to dismiss plaintiff's common law fraud claims on summary

judgment.  Plaintiff has provided at least seven specific dates on which she spoke to Verizon in

winter and spring 2007 and Verizon allegedly promised to fix the routing and switching errors

but did not do so.  A reasonable jury may infer that, at some point, Verizon knew that the

problem would not be fixed, that plaintiff would rely on Verizon's representation and continue to

incur the wrongful billing charge, that it was reasonable for plaintiff to so rely, and that plaintiff

was damaged as a result.  This cannot be resolved by the Court on summary judgment.

        The Court also will not dismiss plaintiff's common law fraud claims against

AT&T.  Plaintiff represents that AT&T specifically told her in January 2007 that it could do

nothing about the routing problem, and that it put on hold an outside collection agency's efforts

to collect past due collections on hold.  Plaintiff represents that on April 19, 2007, AT&T told

her that she had a zero account balance.  However, plaintiff alleges that she continued to receive

bills for calls due to the routing error and that in, July 2008, AT&T was continuing to try to

collect payments from her.  The Court finds that plaintiff's Eighth Claim should not be dismissed

at this time.

NOT FOR PUBLICATION

9.      <u>Defamation</u> (Ninth Claim)

Under New Jersey law, to establish a prima facie case of defamation, a plaintiff

must show, in addition to damages, that a defendant "(1) made a defamatory statement of fact (2)

concerning the plaintiff (3) which was false, and (4) which was communicated to a person or

persons other than the plaintiff." <u>Feggans v. Billington</u>, 291 N.J. Super. 382, 390-91 (App. Div.

1996). <u>See also</u> <u>Russo v. Nagel</u>, 358 N.J. Super. 254, 262-63 (App. Div. 2003).  In cases where a

 "plaintiff is a private figure and the speech is about an exclusively private concern," the plaintiff

can show that the defendant acted with negligence, "which is defined as communicating the false

statement while acting negligently in failing to ascertain the truth or falsity of the statement

before communicating it." <u>Feggans</u>, 291 N.J. Super. at 391 (citing <u>Turf Lawnmower Repair, Inc.</u>

<u>v. Bergen Record Corp.</u>, 139 N.J. 392, 402-13 (1995)).

Plaintiff states that Defendants "published and disseminated false and inaccurate

information concerning Plaintiff with reckless disregard for the truth of the matters asserted."

(Compl. ¶ 104.)  She claims that "defendants were notified of inaccuracies and problems by

plaintiff, however, the defendants continued to issue and/or publish report(s) to third parties,

which contained inaccurate information about plaintiff."  (Compl. ¶ 105.

Plaintiff cannot sustain any claim of defamation against Verizon because Verizon

is not alleged to have made any false statements about plaintiff.

Plaintiff alleges that AT&T is liable for defamation because, after it was "notified

of inaccuracies and problems by plaintiff," it "continued to issue and/or publish report(s) to third

parties, which contained inaccurate information about plaintiff."  This is a viable cause of action.

-26-

NOT FOR PUBLICATION

Plaintiff alleges that, even though AT&T knew in January 2007 that she was not making long distance calls on the AT&T effort, AT&T continued to bill her for such calls and to inform a third party collection agency (Southwest Credit) that plaintiff had failed to pay her bills for calls that were wrongfully attributed to her.  This is a factual scenario in which a reasonable jury may find AT&T liable for defamation.  The defamation claim against AT&T will not be dismissed on summary judgment.

          10.    <u>Infliction of Emotional Distress</u> (Tenth Claim)

          Plaintiff contends that Defendants  "recklessly and/or intentionally caused severe emotional distress to Plaintiff without protection of law and at a time when they knew or should have known that its actions would do so."  (Compl. ¶ 111.)

          To prevail on a claim for intentional infliction of emotion distress, New Jersey law requires a plaintiff to establish "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."  <u>Buckley v. Trenton Sav. Fund Soc'y</u>, 111 N.J. 355, 366 (1988).  "Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. . .  Second, the defendant's conduct must be outrageous.  The defendant's conduct must be 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, to be regarded as atrocious, and utterly intolerable in civilized society.'  Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress.  Fourth, the emotional distress suffered by plaintiff must be 'so severe that no reasonable man could be expected to endure it.'"  <u>Buckley</u>, N.J. 355 at 366 (quoting Restatement (second) of Torts, § 46 (1966)).

NOT FOR PUBLICATION

The first prong of this tort requires intentional or reckless behavior.  "For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress.  Liability will also attach when a defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow."  Spagnoli v. Brown

The outrageousness prong of this tort is an "elevated threshold" that is satisfied only in "extreme cases."  Anastasia v. Cushman & Wakefield, No. 08-cv-1880, 2009 U.S. Dist. LEXIS 20283, at *10 (D.N.J. March 13, 2009) (citing Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23 (App. Div. 2001)).  The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 366 (1988).  In New Jersey, courts have found this threshold satisfied "when a landlord failed to provide central heating, running water, and reasonable security in a rent controlled building in an effort to induce the tenants to vacate; when a doctor allegedly told a child's parents that he was suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix; and when an employer referred to an African-American employee as a jungle bunny."  Griffin, 337 N.J. Super. at 23 (internal citations and quotation marks omitted).  By contrast, New Jersey courts "have rejected intentional infliction of emotional distress claims based on an employer's alleged denial of promotions and ultimate promotions of an employee based on his age; a police department's demand that an officer undergo a 'fitness for duty' examination, which included drug testing and psychological evaluation, as a condition of returning to work after a domestic violence incident; and a wife's

-28-

NOT FOR PUBLICATION

eleven year adulterous affair with her boss." <u>Id</u>.  The New Jersey Supreme Court has stated that

if a bank acts "intentionally, as well as recklessly or outrageously," in dishonoring a check, and

causes "severe" distress or bodily injury, then the bank's conduct can give rise to a claim for

intentional infliction of emotional distress.  <u>Buckley</u>, 111 N.J. at 366.

        Concerning the emotional distress prong, in <u>Buckley</u> the plaintiff complained of a

loss of sleep, aggravation, embarrassment, headaches, and nervous tension.  The New Jersey

Supreme Court held that the plaintiff's suffering was insufficient to support recovery under a

infliction of emotional distress cause of action, because plaintiff "did not claim interference with

his everyday routine as a result of his mental distress"; plaintiff was not worried "that his wife

and children would go without food"; he failed to show that his emotional distress was

"prolonged" and he failed to describe the frequency of his headaches, or their length and

intensity.  <u>Buckley</u>, 111 N.J. at 368-69.  Courts have required a plaintiff to show a "severe and

disabling emotional or mental condition which may be generally recognized and diagnosed by

professionals trained to do so.  <u>Griffin</u>, 37 N.J. Super. at 26 (quoting <u>Taylor v. Metzger</u>, 152 N.J.

490, 515 (1998).

        This cause of action will not be dismissed at this stage.  A reasonable jury could

find that defendants acted recklessly in causing plaintiff to be billed for calls they knew, or

should have known, that she did not make, and that defendants deliberately disregarded a high

degree of probability that plaintiff would suffer emotional distress as a result of the wrongful

billing over a prolonged time period.  Additionally, a reasonably jury could find that the alleged

misconduct was sufficiently outrageous because it was prolonged, blatantly wrongful, and likely

-29-

**NOT FOR PUBLICATION**

to produce injurious effects.  Lastly, plaintiff has submitted evidence that she was hospitalized, received treatment for anxiety, and advised to take off from work during the time that she was allegedly wrongfully billed for phone calls.  These symptoms of emotional distress are significantly stronger than those symptoms suffered by the plaintiff in <u>Buckley</u>, and a jury may find that defendant's conduct caused her to suffer severe emotional distress.  Plaintiff may proceed with her claim for intentional infliction of emotional distress.

<b>CONCLUSION</b>

The Court finds that the Tariff does not preclude plaintiff's claim because it states that states that Verizon is liable for damages "caused by the negligence of the . . . Company in failing to maintain proper standards," which is alleged to be the case here.  (Tariff ¶ 2.4.1.)  The Court allows plaintiff to proceed with her negligence, common law fraud, and intentional infliction of emotional distress claims against both defendants.  The Court allows plaintiff to move forward with her breach of contract claim against Verizon.  The Court allows plaintiff to proceed with her defamation claim against AT&T.  The Court dismisses with prejudice plaintiff's claims for violations of the Fair Credit Billing Act (First Claim), Fair Debt Collection Practices Act (Second Claim), Fair Credit Reporting Act (Third Claim), and New Jersey Consumer Fraud Act (Fifth Claim).  The Court refers plaintiff's claim for violation of the Wire or Radio Communication Act (Fourth Claim) to the Federal Communications Commission under the doctrine of primary jurisdiction.

July 27, 2010                          <u>**s/William H. Walls**         </u>
                                       United States Senior District Judge

-30-